UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| CITY OF HAMMOND, THOMAS McDERMOTT, EDUARDO FONTANEZ, and LONNIE RANDOLPH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:21CV160-PPS |
| LAKE COUNTY JUDICIAL NOMINATING COMMISSION, the STATE OF INDIANA, SECRETARY OF STATE DIEGO MORALES, and the LAKE COUNTY BOARD OF ELECTIONS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Here in Indiana, people in Marion, Lake, and St. Joseph Counties, where there is a high percentage of black voters, are unable to vote for superior court judges. By contrast, in the other 89 counties in Indiana where there is a comparatively low percentage of black voters, those folks are trusted with the franchise; they elect their superior court judges. Why does Indiana treat citizens in the three counties with a large percentage of black voters differently from everyone else in the State? That question is the principal subject of this litigation. In legal terms the issue is whether this construct violates the Voting Rights Act.

Thomas McDermott is the mayor of Hammond, Indiana, a resident of Lake County, Indiana, an attorney, and a registered voter. [DE 58 at ¶5; DE 97 at ¶2.] Lonnie Randolph is an attorney, registered voter, and a State Senator representing Lake County,

Indiana. [DE 58 at ¶6; DE 97 at ¶3.]  Randolph is African-American.  [DE 58 at ¶6.]
Eduardo Fontanez is Hispanic and a registered voter in Lake County.  [*Id*. at ¶7; DE 97 at
¶4.]  He is also an attorney and previously served as an East Chicago City Court judge.
[DE 58 at ¶8; DE 97 at ¶4.] Named as defendants are the Lake County Judicial
Nominating Commission, the State of Indiana, the Indiana Secretary of State, and the
Lake County Board of Elections. By agreement of the parties, the Judicial Nominating
Commission was previously dismissed without prejudice.  [DE 71.]

Count I of the Second Amended Complaint is a claim that the "lesser and unequal
voting rights" of Lake County citizens violate Section 2 of the Voting Rights Act, 52
U.S.C. §10301.  [DE 58 at 6.]  Counts II, II and IV are state law claims for alleged
violations of the Indiana Constitution.

There are three motions for summary judgment pending, one by the plaintiffs,
one by the State/Secretary of State, and one by the County Board of Elections.  While I
have substantial doubts that the Voting Rights Act isn't being violated by the differential
treatment of Lake County voters, I am bound by controlling authority from the Seventh
Circuit that holds otherwise. I will therefore grant the State Defendants' summary
judgment motion on the Voting Rights Act claim and will relinquish jurisdiction over the
supplemental state law claims.

**Summary Judgment Standards**

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall
grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a). A motion for summary judgment has been described as the time in a lawsuit to

"put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir.

2017). A genuine dispute of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). "With cross summary judgment motions, we

construe all facts and inferences therefrom in favor of the party against whom the

motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir.

2020) (internal quotation omitted).

The determination what material facts are undisputed is obviously critical in the

summary judgment context, and the rule requires the parties to support facts, and

disputes of fact, by "citing to particular parts of materials in the record," or by "showing

that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1).

The defendant Board of Elections is the local governmental unit that oversees

elections in Lake County, Indiana, and administers the retention votes for Lake County

Superior Court judges. [DE 109 at ¶42.] In response to plaintiffs' Statement of Material

Facts, the Election Board repeatedly responds in a perplexing way as if it were

answering the complaint instead of responding to a summary judgment. The Election

Board tells me that "it is without sufficient knowledge to admit or dispute" the fact, but

asserts that the fact "has not been expressly pled against the Election Board." [DE 103 at ¶¶2, 4-38 .] Whatever else the Election Board intends by this assertion, it is not a dispute of the fact asserted by plaintiffs, and lacks either the citation to evidence required in support of each dispute of fact or a showing that plaintiffs have not cited admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1); N.D.Ind. L.R. 56-1(b)(2)(C). Neither does the Election Board seek relief under Rule 56(d) by attempting to show that, for specified reasons, it cannot present facts essential to justify its opposition to the facts plaintiffs assert. I will therefore consider each fact responded to in this way to be undisputed by the Election Board.

### Undisputed Facts

For over a century, judges at all levels in Indiana were selected through partisan elections. [DE 97 at ¶5.] This system led to criticism regarding impartiality, judicial independence, and the continued ability to select high quality trial judges. [*Id*. at ¶6.] The system now in place in Indiana for selecting superior court judges is a bit of a hodgepodge. Essentially, each county has a state statute governing its judicial selection process. Ind. Code § 33-33, *et. seq.* Although the statute refers to them as "judicial circuits," the boundaries of each county are what define the circuits. *Id.* In an overwhelming number of counties, superior court judges are still selected by the franchise. *Id.* But in three of the most densely populated counties—Marion, Lake and St. Joseph Counties—superior court judges are appointed by the governor. *Id.*

4

According to 2020 Census data, 193,504 black residents 18 years old or older reside in Marion County, Indiana. [DE 101 at ¶8.] In Lake County, there are 89,806 black residents age 18 or older. [*Id*. at ¶9.] And in St. Joseph County, Indiana, there are 25,176 black residents age 18 or older. [*Id*. at ¶10.] These three counties make up nearly 66% of the total black residents in Indiana (308,486 out of Indiana's total of 467,861 black residents age 18 or older). [*Id*. at ¶¶11-13.] Put another way, two-thirds of black people of voting age in Indiana—those who reside in Lake, Marion and St. Joseph Counties—are unable to vote to elect the vast majority of their state court judges. [*Id*. at ¶13.] By contrast, 81% of whites who reside in Indiana live in one of the 89 Indiana counties other than Lake, Marion and St. Joseph Counties, and they *can* vote to elect all their superior court judges. [*Id*. at ¶¶34-37.]

To explain how we got to this patchwork of judicial selection in Indiana we need to go back in time for a bit of a history lesson. In 1965, the Indiana General Assembly established the Judicial Study Commission, and later initiated a constitutional amendment process that led to changes in the selection process for Indiana judges. [DE 97 at ¶8.] Plaintiffs do not dispute that the Commission was tasked with evaluating Indiana's judicial selection process (at that time through partisan political elections) and considering selection alternatives, as part of a state judicial reform movement. [DE 97 at ¶9.]

As part of the evaluation, the Commission sent questionnaires to Indiana attorneys and judges. [*Id*. at ¶10.] The questionnaire results showed that 79% of

Indiana attorneys surveyed believed the partisan election system "could not continue to provide...highly qualified trial judges," and 87% of Indiana attorney-respondents believed politics influenced judicial decisions to varying degrees.  [*Id.* at ¶11, quoting the Affidavit of Jerold A. Bonnet, General Counsel of the Indiana Secretary of State, quoting Edward W. Najam, Jr., *Merit Selection in Indiana: The Foundation for a Fair and Impartial Judiciary*, 46 IND. L.REV. 15, at *19 (2013) (DE 81-2 at 4).][1]

The General Assembly subsequently initiated a constitutional amendment process that included revisions to Article 7 of the Indiana Constitution adopting merit selection for Supreme Court and Court of Appeals judges.  [DE 97 at ¶12.]

In 1972, Senate Enrolled Act 22 directed the Judicial Study Commission to conduct a study specific to Lake County's court system and to report its findings during the 1973 legislative session.  [DE 97 at ¶15.][2]  A report purporting to be the Institute for Court Management's "A Program for the Improved Administration of Justice in Lake County" is submitted as Exhibit 4 to the State Defendants' motion for summary judgment, and the Plaintiffs do not challenge it per se.  [DE 81-4.]  Bonnet's Affidavit presents his synopsis of certain findings of the ICM report:  "The majority of Lake

---

[1] The State Defendants repeat Mr. Bonnet's mis-quote of the Najam article and of the 1965 questionnaire, in that Bonnet (and the State Defendants) refer to political influence on judicial "selection" when the article quotes the survey as referring to judicial "decisions."  [DE 81-2 at 4.] In the present context, the error is potentially significant.  I have corrected the finding to refer to judicial "decisions."

[2] The State Defendants introduced the "Judicial Study Commission" into their statement of material facts, providing as a shorthand "the Commission."  [DE 97 at ¶8.]  The State Defendants thereafter repeatedly refer to "the JNC," which looks like it refers to the defendant "Judicial Nominating Commission" rather than "JSC" for "Judicial Study Commission."  From context, however, each appearance of "JNC" appears to represent the Judicial Study Commission.

County attorneys and judges ICM interviewed were dissatisfied with partisan election of judges in Lake County, which ICM found contributed to an attorney-managed administration of justice, unequal caseloads among Lake County judges, inconsistent application of Indiana's trial rules and an excessive number of cases being sent by Lake County judges to venues in outside counties."  [DE 81-1 at 5 (Bonnet Affidavit, ¶14).]

In 1973, the Indiana General Assembly adopted a hybrid appointment and retention merit system known as "The Missouri Plan" for selecting Lake County superior court judges in the civil, criminal and juvenile divisions.  [DE 97 at ¶17.]  A version of this hybrid system remains in effect today for Lake County Superior Court judges, in which merit selection is used to appoint judges, with retention elections for incumbents.  [*Id*. at ¶18.] Here's how it works: under Indiana Code §33-33-45-38, a Lake County Superior Court vacancy "shall be filled by appointment of the governor from a list of five (5) nominees presented to the governor by the judicial nominating commission."  [DE 97 at ¶19.]  Appointees then face retention elections after two years, and, if retained, can serve successive 6-year terms, each subject to a retention vote, as prescribed in Ind. Code §33-33-45-41.  [*Id*.]

In 2008, the Judicial Conference of Indiana developed a Strategic Plan for the future of Indiana's judicial branch, steered by a Strategic Planning Committee organized by former Chief Justice Randall T. Shephard.  [DE 97 at ¶20.]  The plan describes a decades-long measure to reform Indiana's judicial branch, including moving towards a

unified court system, a state-centralized funding source, and merit selection of all trial

court judges, among other things.  [DE 97 at ¶21.]

By the affidavit of General Counsel Bonnet, the State Defendants express the

following view: "A merit selection process is essential in a highly populated and highly

diverse jurisdiction like Lake County to provide safeguards for limiting political

influence in Lake County superior courts."  [DE 81-1 at ¶18.] The State identifies the

purposes of the Lake County selection process as "to ensure fairness, integrity, impartial

administration of justice, and judicial accountability." [DE 81-1 at ¶21.] The State

believes it "has a compelling interest in judicial independence, impartiality, fairness, and

judicial accountability" that "has long required some specialization in Indiana counties

to ensure the judicial selection process reflects the diversity of the jurisdiction." [DE 81-1

at ¶22.]

## Discussion

### The Voting Rights Act Claim – Count I

Section 2 of the Voting Rights Act provides that "[n]o voting qualification or

prerequisite to voting or standard, practice, or procedure shall be imposed or applied by

any State or political subdivision in a manner which results in a denial or abridgement of

the right of any citizen of the United States to vote on account of race or color."  52

U.S.C. §10301(a).  Section 10301(b) provides that:

[a] violation of subsection (a) is established if, based on the totality of
circumstances, it is shown that the political processes leading to
nomination or election in the State or political subdivision are not equally
open to participation by members of a class of citizens protected by

subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Plaintiffs contend that the VRA is violated because in Lake County, due to its high minority population, residents are unable to vote for superior court judges, and instead "only retain the lesser and unequal right to vote in retention elections" for judges of the superior court.  [DE 58 at ¶¶44-46.][3]

For starters, it is clear that the VRA applies to judicial elections. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). But, of course, a state isn't required to elect judges. A state is permitted to pick judges through an electoral process or through an appointive process, and the VRA has nothing to say about that choice. *Id*. at 401.  But can Indiana, consistent with the VRA, pick and choose on a county-by-county basis to appoint *state* judicial officers in some counties while electing them in others? That's the question to be answered in this case.

_____

[3] There is an initial question of whether there is a private right of action to enforce §2 of the VRA. The Eighth Circuit recently issued a rather surprising opinion concluding that there is not. *Arkansas State Conference NAACP v. Arkansas Board of Appointment, et al.*, No. 22-1395, ___ F.4th ___, 2023 WL 8011300, at *1 (8th Cir. Nov. 20, 2023).  The decision was roundly criticized by Chief Judge Smith in dissent, *id*. at **12-15, citing the years of contrary precedent, including numerous cases of the United States Supreme Court in which a private plaintiff's right to bring §2 challenges has not been questioned, or even, as in *Morse v. Republican Party of Virginia*, 517 U.S 186, 232, 240 (1996), was expressly presumed to exist.  "Furthermore, since the Court decided *Morse*, 'scores if not hundreds of cases have proceeded under the assumption that Section 2 provides a private right of action.  All the while, Congress has consistently reenacted the VRA without making substantive changes, impliedly affirming the previously unanimous interpretation of Section 2 as creating a private right of action.'"  *Id*. at *16, quoting *Coca v. City of Dodge City*, No. 22-1274-EFM, ___ F.Supp.3d at ___, 2023 WL 2987708, at *4 (D.Kan. June 12, 2023) (Melgren, C.J.).  My analysis is unaffected by the Eighth Circuit's *Arkansas* decision, both because it is not binding in this Circuit and because, like Chief Judge Smith and Chief Judge Melgren, I recognize the "simple fact" that a majority of Supreme Court justices "explicitly recognized a private right of action under Section 2 in *Morse*," and the Court "has yet to overrule itself on that precise issue."  *Coca*, 2023 WL 2987708, at *5.  *See also Arkansas State Conference NAACP*, 2023 WL 8011300, at *16.

Plaintiffs argue that the differential judicial selection procedure used in Indiana is a standard, practice or procedure that abridges Lake County residents' right to vote on account of race or color, in violation of §10301(a). As Plaintiffs put it, "The State has designated evidence that it maintains the current voting scheme for the purpose of 'limiting political influence' in a 'highly diverse jurisdiction like Lake County.'" [DE 100 at 7, quoting DE 81-1 at ¶18.] In other words, the Plaintiffs seek summary judgment on the VRA claim because the State's reliance on "diversity" as a basis for the judicial selection system the State has constructed is tantamount to an *admission* of a violation of §10301(a) on its face. [DE 100 at 10-11.] In terms of §10301(b), the Plaintiffs' position is that the political process leading to nomination or election of superior court judges is not equally open to the participation of Lake County residents as it is to residents of most other judicial districts in Indiana, and this is so due to considerations of race or color.

Plaintiffs' theory for a violation of §2 seems sound to me. For starters, the statistics alone are jarring. How is it that 66% of blacks in Indiana are prevented from voting for superior court judge when more than 80% of whites can? More startling still is the fact that, as I just noted, the State has *all but admitted* that there is a race-based motivation behind this paradigm. Look no further than the affidavit submitted by the Secretary of State's General Counsel, Mr. Bonnet: "A merit selection process is *essential in a highly populated and highly diverse* jurisdiction like Lake County to provide safeguards for limiting political influence in Lake County superior courts." Affidavit of Jerold A. Bonnet, General Counsel to the Indiana Secretary of State [DE 81-1], ¶18 (emphasis

10

added).  Let's not beat around the bush: the reference to "diversity" is a not so subtle reference to race. The State thus appears to acknowledge that the "diversity" of Lake County, meaning the significant presence of racial minorities among its electorate, is a reason that superior court judges are not chosen by election but by a merit selection process instead.  In the language of §2, the State of Indiana has imposed a procedure on Lake County that denies its citizens the right to vote for superior court judges on account of race or color.

For its part, the State Defendants seek summary judgment on the Voting Rights Act claim by arguing that "the VRA does not apply to judicial *appointments*, but rather to judicial elections." [DE 99 at 2 (emphasis in original); *see also* DE 82 at 9.] While that may be a correct statement of law, it's a straw man argument. It misses the whole point of the Plaintiffs' theory of the case, which I'll discuss in a moment. But before we get there, we need to first examine the cases in support of the State's undisputed legal proposition: *Sailors v. Bd. of Educ. of County of Kent*, 387 U.S. 105 (1967), *Bradley v. Work*, 154 F.3d 704 (7th Cir. 1998) and *Quinn v. Illinois*, 887 F.3d 322 (7th Cir. 2018).

Let's start with *Sailors.* The State's reliance on that case badly misses the mark, because it involved an Equal Protection challenge to the organization of school boards in Michigan and did not involve a claim under the VRA.  What the Supreme Court held in *Sailors* was that "[a]t least as respects nonlegislative officers, a State can appoint local officials or elect them or combine the elective and appointive systems as was done here." *Id*. at 111. Importantly, *Sailors* contained no claim of race discrimination.  But

11

interestingly, in an aside, the Supreme Court noted that "[a] State cannot of course manipulate its political subdivisions so as to defeat a federally protected right, as for example, by realigning political subdivisions so as to deny a person his vote because of race." *Id.*, 376 U.S. at 108.  Plaintiffs would doubtless see an application of that dictum to this case.

The next case relied on by the Defendants—*Bradley v. Work*, 154 F.3d 704 (7th Cir. 1998)—is equally beside the point. The State claims that *Bradley* involved "the same claims as Plaintiffs make here," and the Court of Appeals "held that this same statutory scheme presented no violation of the VRA." [DE 99 at 4.] In *Bradley*, black Lake County voters appealed to the Seventh Circuit the issue "whether the system of appointment plus retention elections for the Superior Court judges...violates either the Voting Rights Act or the Constitution." *Id.* at  706. Characterizing the issue presented as "a §2 vote dilution claim," the court joined the district court in assuming that the voters had "satisfied the three preliminary [*Thornburg v.*] *Gingles* [478 U.S. 30, 50-51 (1986)] criteria, and moved directly to the totality of the circumstances inquiry."

Arriving at the meat of the matter, the district court had punted, deciding that, because the state legislature had amended the judicial nomination process during the course of the litigation, the court "should not issue a declaratory judgment on either the old, superseded electoral process, or the new, untested one." *Bradley*, 154 F.3d at 710. Without explaining the *Bradley* plaintiffs' theory as to why the Lake County process at that time violated the VRA, the Seventh Circuit agreed that the plaintiffs' challenge to

the former system was moot.  *Id.*  Rather than doom any VRA challenge to the new

scheme, the Seventh Circuit said that "[f]uture litigation may prove that the 'totality of

the circumstances' under the revised system shows a violation of the mandates of the

Voting Rights Act."  *Id.*  So the *Bradley* decision decides nothing except that §2 applies to

retention elections, and leaves the door open for precisely the claim the Plaintiffs make

here.

Finally, the State relies on *Quinn v. Illinois*, 887 F.3d 322 (7th Cir. 2018), which in

contrast to *Bradley* and *Sailors,* is much more supportive of the State's argument.  *Quinn*

involved an action by voters challenging the Illinois law providing that Chicago School

Board members are appointed by the mayor. The voters contended that because school

board members elsewhere in Illinois are elected, the lack of such a vote in Chicago

disproportionately impacted minority voters.  *Id*. at 323.  Here's how the Seventh Circuit

summarized the *Quinn* plaintiffs' position:  "They observe that everyone in Rockford or

Springfield or Peoria can vote for local school boards while black and Latino citizens in

Chicago cannot; the political process in Illinois thus is not 'equally open' to minority

voters."  *Quinn*, 887 F.3d at 324.  The court rejected this in summary fashion for two

reasons.  The first reason given was that "as far as we are aware no court has understood

§2 to require that any office be filled by election," and §2 does not apply "unless an office

is elected."  *Id*. at 324 (citing cases), 325.  The second reason blithely given for rejecting

the plaintiffs' VRA claim was that in Chicago no one votes for the school board, so all are

"treated identically, which is what §2 requires."  *Id.*

In *Quinn*, the voter-plaintiffs' claim was not that a particular appointed position (school board member) should be elected instead, but that State law abridged only certain citizens' ability to vote for the position, based on race.[4]  No explanation was given in *Quinn*, and none is offered by the State Defendants here, as to *why* §2 has no application to the voters' challenge, although it is expressly based on the lack of equal voting rights on account of race or color, which is the very heart of §2.

Reliance on the principle that the VRA does not require superior court judges to be elected seems a trick of misdirection based on a mischaracterization of Plaintiffs' actual claim, and it ignores the racial discrimination element of that claim.  The Plaintiffs before me do not dispute that the VRA would not be violated if Indiana enacted a statewide system of appointment of all judges (or all judges of a certain type).  [DE 106 at 1.]  Their argument is not that all superior court judges must be elected rather than appointed. Instead, they posit that if Indiana law permits superior court judges to be elected in 89 judicial districts (which happen to be overwhelmingly white), then Indiana law should do the same thing in Lake County where there is a high percentage of black voters. In short, in the language of the VRA, if voters in Lake County are denied the right to elect superior court judges on account of the racial makeup of the county, §2 is violated because they "have less opportunity" to participate in the political process than other voters around the state.

---

[4] Note that §10301(a) prohibits the abridgement of any citizen's right to vote "on account of race or color," *not* "on account of *his or her* race or color."  So §2 is concerned with any denial of a right to vote that is based on considerations of race, and is not limited to denial of voting rights to would-be voters of a particular race.

Similarly as to its second rationale, *Quinn* offers no explanation why the City of Chicago rather than the State of Illinois is the relevant jurisdiction for §2 analysis. In the recent VRA §2 case of *Brnovich v. Democratic National Committee*, 594 U.S. ___, 141 S.Ct. 2321 (2021), the United States Supreme Court advised that "courts must consider the opportunities provided by *a State's entire system of voting* when assessing the burden imposed by a challenged provision." *Id.* at 2339 (emphasis added.)  Furthermore, the Indiana Supreme Court has observed that: "trial courts are units of the judicial branch of our state's constitutional system and thus state entities."  *Lake County Board of Commissioners v. State*, 181 N.E.3d 960, 961 (2022).  In a situation that involves a *state* judicial office, whose officers are paid by the *state,* who collect a *state* pension upon retirement and whose positions are a creation of *state* law, I'm at a loss to see why the appropriate comparison isn't the State's entire voting system.

In other words, why is the pertinent comparison not to other counties in which the State has granted the vote for selection of judges of the State?  Suppose the evidence in this case were even more blunt than it already is, and there was legislative history indicating the Lake County procedure was enacted because the legislature believed Lake County had too many black people who couldn't be entrusted with electing qualified judges. Would the State still insist that §2 of the VRA was not implicated? Is racial bias immunized when it motivates exclusion of an electorate with a high minority population rather than a more overt exclusion of minority voters specifically?

15

With respect, I find the Seventh Circuit's reasoning in *Quinn,* and the cases in which it cites, to be unsatisfying, especially in light of *Brnovich,* as discussed below. Nonetheless, *Quinn* is controlling law and I am not free to disregard it where it plainly applies. And I agree with the State Defendants that *Quinn* is controlling here.  The argument of both the Plaintiffs here and in *Quinn* is that state law deprives their political subdivision (and them) of the right to vote for a particular officeholder on account of race or color, and that the nomination or election of those officeholders is not equally open to participation of their electorate as compared to members of other political subdivisions of the state.

Plaintiffs attempt to distinguish *Quinn* by arguing that "it involved an appointed local position, and it may be appropriate in those circumstances to focus only on the locality." [DE 106 at 4.]  By contrast, Plaintiffs suggest that "this case involves a state office that all voters across the state vote on." [*Id.*]  The distinction, for which Plaintiffs cite no authority, is not persuasive.  Both cases challenge a state law that treats one local political subdivision (a school board or a judicial district) differently from the vast majority of the state's other political subdivisions of the same type.  The Superior Courts of Indiana, like the school boards of Illinois, derive their existence from and are governed by the State Constitution and State law. Plaintiffs don't succeed in establishing a meaningful distinction between the Chicago School Board on the one hand, and Lake County's Superior Court on the other, which appear to be analogous for purposes of the Seventh Circuit's analysis of similar claims under §2 of the VRA.

In short, whether or not I find *Quinn* persuasive, I must apply it here and grant the State Defendants summary judgment on Count I, finding as a matter of law that §2 of the VRA is not violated by the Lake County Superior Court judicial selection procedure provided in Article 33 Chapter 45 of the Indiana Code.

Plaintiffs argue that *Brnovich* has changed the landscape and mandates a different result here. [DE 100 at 11.] As discussed below, I think they're correct, but with *Quinn* in the way, that is a matter that only the Circuit can address. *Brnovich* involved a challenge under §2 of the VRA to several restrictions on "how ballots are collected and counted" in Arizona. *Brnovich*, 141 S.Ct. at 2330. The challenged regulations restricted the place of in-person voting on election day in some counties, and prohibited collection of mail-in ballots by anyone besides election officials, mail carriers, and a voter's caregiver or members of his household or family. *Id.* The Supreme Court considered the reach of §2:

> The key requirement is that the political processes leading to nomination and election (here, the process of voting) must be "equally open" to minority and non-minority groups alike, and the most relevant definition of the term "open," as used in §2(b), is "without restrictions as to who may participate," Random House Dictionary of the English Language 1008 (J. Stein ed. 1966), or "requiring no special status, identification, or permit for entry or participation," Webster's Third New International Dictionary 1579 (1976).

*Id.* at 2337. The majority held that §2 can be violated by a facially neutral law or practice, and proof of discriminatory purpose is not required. *Id.* at 2341. The Supreme Court held that "neither Arizona's out-of-precinct rule nor its ballot-collection law violates §2 of the VRA." *Id.* at 2343-44.

17

*Brnovich* highlights five important "guideposts" relevant to the required consideration of "the totality of circumstances" under §2(b). *Id*. at 2336. These are: (1) the size of the burden imposed by a challenged voting rule, (2) whether a voting rule departs from what was standard practice in 1982 when §2 was amended, (3) the size of any disparate impact on different racial or ethnic groups, (4) "the opportunities provided by a State's entire system of voting," and (5) the strength of the State's interests served by the challenged voting rule.   *Id*. at 2338-39.  In my view, these five factors weigh heavily in favor of Plaintiffs' §2 claim here.

Applying the five *Brnovich* factors requires consideration of "a State's entire system of voting when assessing the burden imposed by a challenged provision."  *Id*. at 2339.  As I've noted, the State asserts, without any supporting explanation or cite to any authority, that "the correct electorate to compare Lake County minority voters to is other Lake County registered voters and not Indiana as a whole."  [DE 99 at 5.] This makes little sense to me. As I noted above, the superior courts in Indiana are State-created entities and State law has created the procedure that is challenged as violating §2.  Why is our comparison limited to Lake County? What's more, *Brnovich* observes that the required consideration of a State's entire system of voting "follows from §2(b)'s reference to the collective concept of a State's 'political processes' and its 'political process' as a whole."  This language appears to support comparison of Lake County voters' rights with those of other counties across the State of Indiana.

Plaintiffs contend that the *Brnovich* substantial burden factor favors their argument, because they would have to move to a different county in order to be able vote for superior court judges – a substantial burden in order to enjoy the same voting privileges as residents of most other Indiana counties. [DE 85 at 14.] By limiting consideration just to Lake County's citizens, the State Defendants contend there is no burden associated with the challenged law because all Lake County residents are treated the same. [DE 99 at 5-6.] As I've indicated, I don't find Defendants' analysis limiting consideration to just the Lake County electorate to be a fair characterization of Plaintiffs' theory or to be supported by a cogent legal explanation.

As for the factor of widespread currency in 1982, Plaintiffs argue that the hybrid Indiana system was not in widespread use, pointing out that in 1982 only two other states besides Indiana (Missouri and Arizona) had such systems in which only certain portions of the state had trial judges selected by nomination rather than election. [DE 85 at 16.] Applying this factor, the State Defendants would consider only the process in place *in Lake County* in 1982. [DE 99 at 6-7.] They cite the *Quinn* decision for that limitation, but *Quinn* preceded *Brnovich* and engages in no consideration of what was standard practice in 1982 when §2 was amended. Finally, *Brnovich* itself shows that this factor is concerned with what was standard practice in 1982 not just in a particular jurisdiction, but across multiple States or other political subdivisions across the United States. *Brnovich*, 141 S.Ct. at 2338-39.

19

The next *Brnovich* factor is the size of the disparities in the challenged rule's impact on different racial and ethnic groups. Based on the undisputed statistics, more than 80% of white Hoosiers of voting age live in judicial circuits where all state court judges are elected. [DE 101 at ¶¶34-37.] By comparison, the three counties (including Lake County) in which superior court judges are appointed subject to retention votes are home to 66% of Indiana's black voting age residents. [DE 101 at ¶13.] To say the least, as it relates to choosing judges, there's a huge disparity between how Indiana's white and black citizens are treated.

Next, *Brnovich* considers the opportunities provided by the State's entire system of voting. This factor clearly militates in favor of a finding that §2 is violated, in that state law overtly treats Lake County differently than most of Indiana's other counties, and the State has admitted that the motivation for the difference is, in part, the racial and ethnic "diversity" of Lake County. The State Defendants again attempt to moot both the racial disparity and relative opportunities factors by assuming that there are no relevant disparities because only Lake County citizens are considered, an analysis I have found wanting. [DE 99 at 7-8.]

The fifth and final *Brnovich* factor is the strength of the State's interests served by the challenged voting rule. The State Defendants identify a number of interests they say support the merit selection of trial court judges "in a highly populated, heavy caseload area where the public has expressed concern regarding partisan bias." [DE 99 at 8.] These are "maintaining public confidence, judicial independence, impartiality, fairness,

and judicial accountability." [*Id.*]  The State Defendants do not offer evidence to support that the Lake County selection process is particularly suited to meet any of those interests, or that the identified interests are somehow especially associated with a judicial district because it is "highly populated" and has a "heavy caseload."  [By the way, note the convenient omission here of Mr. Bonnet's use of "highly diverse" as a pertinent descriptor of why Lake County requires a merit selection process.]

* * *

Whether appointing superior court judges is a better system then electing them is neither here nor there for present purposes. The question instead is whether under the VRA the General Assembly can withhold the right to vote for a state judicial office in counties with a high percentage of black voters while conferring the right in counties with overwhelmingly white voters. In my view, *Brnovich* requires that question to be answered "no." But because *Quinn* stands in the way, summary judgment will be granted in favor of the Defendants.

## State Law Claims

The remaining claims, Counts II, III and IV of the Second Amended Complaint, assert that the Lake County judicial selection and retention process violates various articles of the Indiana Constitution.  [DE 58 at 9-11.]  Having disposed of the only federal claim, I will decline to exercise supplemental jurisdiction over the state law claims asserted in Plaintiffs' Second Amended Complaint.  Under 28 U.S.C. §1367(c)(1) and (3), I may decline to exercise supplemental jurisdiction over these state constitutional claims

because they raise novel or complex issues of State law, and because I am dismissing all claims over which I had original jurisdiction.  The "usual practice" and the "presumption" in this circuit is that a district court will relinquish supplemental jurisdiction over any state law claims when all federal claims are dismissed prior to trial. *Hagan v. Quinn*, 867 F.3d 816, 830 (7th Cir. 2017).  *See also Al's Service Center v. BP Products North America, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010); *Phillips v. Baxter*, 768 Fed.Appx. 555, 560 (7th Cir. 2019). To the extent the motions for summary judgment address the merits of any of the state law claims, the motions will be denied without prejudice.

**Lake County Board of Elections**

The Lake County Board of Elections is named as a defendant in this case.  As expressed in its own summary judgment motion and in its responses to the motions of the parties, the Board's position amounts to an assertion that it shouldn't be here.   Given the disposition of Count I on the merits and the determination not to exercise supplemental jurisdiction over the remaining state law claims, I dispose of the case without needing to reach the question whether the Board is an appropriate defendant. The Board's motion for summary judgment will be denied without prejudice.

    **ACCORDINGLY:**

    Plaintiffs' Motion for Summary Judgment [DE 84] is DENIED IN PART as to Count I of Plaintiffs' Second Amended Complaint.

The Motion for Summary Judgment of Defendants State of Indiana and Secretary of State Diego Morales [DE 81] is GRANTED IN PART as to Count I of Plaintiffs' Second Amended Complaint.

In all other respects, the pending motions for summary judgment [DE 81, 84, 87] are DENIED WITHOUT PREJUDICE.

Counts II, III and IV of the Plaintiffs' Second Amended Complaint are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. §1367(c)(1) and (3), as the court declines to exercise supplemental jurisdiction over those claims.

The Clerk shall enter judgment in favor of Defendants State of Indiana and Secretary of State Diego Morales and against all Plaintiffs on Count I of Plaintiffs' Second Amended Complaint.  The judgment shall reflect the dismissal without prejudice of Counts II, III and IV of Plaintiffs' Second Amended Complaint pursuant to 28 U.S.C. 1367(c)(1) and (3).  The case will thereby be CLOSED.

**SO ORDERED**.

ENTERED: January 4, 2024.

___/s/ Philip P. Simon_____
**UNITED STATES DISTRICT JUDGE**